**IN THE UNITED STATES BANKRUPTCY COURT**

**FOR THE DISTRICT OF SOUTH CAROLINA**

| | | |
|---|---|---|
| In re: | ) | CHAPTER 11 |
| | ) | |
| HAROLD H. PAVILACK, | ) | CASE NO. 10-06503-JW |
| | ) | |
| Debtor. | ) | |
| _____ | ) | |

**FIRST REPORT OF EXAMINER**

George W. DuRant, CPA
DuRant, Schraibman & Lindsay, LLC
Third Floor, 4408 Forest Drive
Columbia, South Carolina 29206
Tele. (803)790-0020
*Examiner*

Levy Law Firm, LLC
R. Geoffrey Levy, Esquire
I.D. #2666
2300 Wayne Street
Columbia, South Carolina 29201
Tele. (803) 256-4693
*Counsel to the Examiner*

October 26, 2010

**Contents**

Overview of the First Report ............................................................................. 3

Part I – Background & Examiner's Authority .................................................... 4

Part II - Findings ............................................................................................... 7

    Condition of the Debtor's Accounting Records ............................................ 7

    Debtor's Participation in the *Cash Economy* ............................................ 14

    Reduction in Liquidity During 2009 ........................................................... 17

    Debtor's 2009 Income Tax Return ............................................................. 18

    Altered Document Issue .............................................................................. 19

    Other Potential Irregularities ...................................................................... 20

Part III – Approval of the Debtor's Post-Petition Expenditures ...................... 23

Part IV - Plan of Work ..................................................................................... 26

**Overview of the First Report**

This is the First Report of the Examiner (the "Report").  The Report documents the findings and conclusions of George W. DuRant, the duly–appointed examiner (the "Examiner") in the bankruptcy case of Harold H. Pavilack ("Debtor") as of October 26, 2010.

Part I of this Report is a brief summary of the background for this case including the filing of the involuntary petition in bankruptcy against the Debtor, the subsequent filing of a voluntary petition by the Debtor under Chapter 11 of the Bankruptcy Code, and the appointment of the Examiner.

Part II of this Report details some of the Examiner's investigative efforts and findings. Of most concern is the Debtor's admission that beginning in February, 2010 and in order to frustrate the collection efforts of a creditor, the Debtor began doing business in the cash economy.  Furthermore, after acknowledging he was holding cash on October 5, 2010, over the next six days the Debtor turned over three stashes of cash totaling over $1.1 million.  Part II also discusses the Debtor's incomplete accounting records and his resulting inability to demonstrate sources and uses of cash satisfactorily.

Part III of this Report discusses the Examiner's efforts to comply with the Court's order to approve the Debtor's post-petition expenditures.

Part IV of this Report discusses the Examiner's plan of work.

**Part I – Background & Examiner's Authority**

1. Harold H. Pavilack ("Debtor") is approximately seventy-one (71) years old, and a long-time resident of Myrtle Beach, South Carolina.  The Debtor is a prominent lawyer and owns all of the outstanding shares in the law firm Harry Pavilack & Associates, P.A. The Debtor has amassed an extensive portfolio of direct and indirect investments in real estate located primarily in the Grand Strand, Myrtle Beach, South Carolina area.  The Debtor's bankruptcy estate may include interests in more than sixty ostensibly separate, affiliated entities which in the aggregate may own more than four hundred discrete parcels of real estate, most of which are subject to mortgage indebtedness guaranteed by the Debtor.[1]

2. On August 20, 2010, Wells Fargo Bank, N.A., successor-in-interest to Wachovia Bank, National Association, Atlantic Bank & Trust and First Federal Savings and Loan Association of Charleston filed an Involuntary Petition against the Debtor;[2] with Crescent Bank joining in the petition thereafter (the "Petitioning Creditors").  On August 30, 2010, Wells Fargo Bank, N.A., successor-in-interest to Wachovia Bank, National Association, Atlantic Bank & Trust, First Federal Savings and Loan Association of Charleston, and First Bank filed a *Motion to Appoint Interim Trustee Pursuant to 11 U.S.C. §303(g) Or for an Order Prohibiting the Debtor from Using, Acquiring, or Disposing of Property Pursuant to 11 U.S.C. § 303(f)* ('Trustee Motion") alleging:

   a. that from February, 2009 until December, 2009, the Debtor's financial statements reflected a reduction in liquidity in excess of $7,000,000.00;

---

[1] Interview of G. William McCarthy, Debtor's counsel, September 30, 2010.
[2] Case No. 10-05998-JW; Doc. #1 filed and entered on August 20, 2010.

b.  that taxes on properties owned by Debtor or by companies controlled by Debtor remained unpaid for 2003, 2004, 2005, 2006, 2008 and 2009, indicating the Debtor had failed to pay costs associated with preserving the value of significant assets; and

c.  that the Debtor (or employees of the Debtor) had altered the date on a letter from Atlantic Bank & Trust, addressed to an entity controlled by Debtor, without the consent or knowledge of Atlantic Bank & Trust, and presented such altered correspondence to the Housing Authority of the City of Atlanta.[3]

3.  On September 7, 2010, the Debtor filed a voluntary petition under Chapter 11 of the Bankruptcy Code.[4]  On September 10, 2010, the Petitioning Creditors filed a *Motion to Appoint Examiner Pursuant to 11 U.S.C. § 1104* ("Examiner Motion") in that case.[5] The Examiner Motion referenced an agreement between the Petitioning Creditors and the Debtor such that the Debtor, and/or any entity controlled or managed by the Debtor, would make no expenditures without prior approval of the Examiner and without disclosure to the Examiner of the source of funds to be expended.

4.  Pursuant to 11 U.S.C. § 1104, an examiner is required to "conduct such an investigation of the debtor as is appropriate, including an investigation of any allegations of fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the debtor of or by current or former management of the debtor, …"

---

[3] Case No. 10-05998-JW; Doc. #5 filed and entered on August 30, 2010.
[4] Case No. 10-06503-JW; Doc. #1 filed and entered on September 7, 2010.
[5] Case No. 10-06503-JW; Doc. #6 filed and entered on September 9, 2010.

5. Pursuant to 11 U.S.C. § 1106, an examiner is required to "investigate the acts, conduct, assets, liabilities, and financial condition of the debtor, the operation of the debtor's business and the desirability of the continuance of such business, and any other matter relevant to the case or to the formulation of a plan [unless ordered otherwise.]"  An examiner is required to perform except to the extent that the court orders otherwise, any other duties of the trustee that the court orders the debtor in possession not to perform. And, an examiner must "file a statement of any investigation conducted . . . including any fact ascertained pertaining to fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the debtor, or to a cause of action available to the estate."

6. On September 16, 2010, the Court entered its *Order Appointing Chapter 11 Examiner* and directing the United States Trustee to appoint an Examiner upon consultation with the Petitioning Creditors.[6]  On September 20, 2010, the United States Trustee appointed George W. DuRant as Examiner and filed an *Application for Order Approving Appointment of Examiner* with the Court.[7]  On September 27, 2010, the Court entered its *Order Approving Appointment of Examiner* ("Examiner Order").[8]

7. On September 30, 2010, the Examiner filed *Examiner's Application to Appoint Levy Law Firm, LLC as Bankruptcy Counsel Pursuant to 11 U.S.C. §327(a).*[9]  On October 15, 2010, the Court entered its *Order Authorizing Appointment of Levy Law Firm, LLC as Bankruptcy Counsel for Examiner.*[10]

---

[6] Case No. 10-06503-JW; Doc. #22 filed and entered on September 16, 2010.
[7] Case No. 10-06503-JW; Doc. #24 filed and entered on September 20, 2010.
[8] Case No. 10-06503-JW; Doc. #45 filed on September 24, 2010 and entered on September 27, 2010.
[9] Case No. 10-06503-JW; Doc. #56 filed and entered on September 30, 2010.
[10] Case No. 10-06503-JW; Doc. #105 filed on October 14, 2010 and entered October 15, 2010.

8. On October 14, 2010, a *Consent Order Authorizing Debtor's Application (1) to Appoint Marty P. Ouzts as the Debtor's Accountant Pursuant to 11 U.S.C. §327(a) and Authorizing Payment of Retainer* was filed with the Court.[11]  Pending a final hearing, the order granted Mr. Ouzts expanded powers and duties including (a) the responsibility for approval and signing of all checks drawn on the Debtor and any business owned, managed or controlled by the Debtor (except for the trust accounts at Harry Pavilack and Associates, PA and Pavilack Law Firm, LLC); and (b) review and approval, but not signing authority, for trust account checks drawn on the law firm Harry Pavilack and Associates, PA, and Pavilack Law Firm, LLC (signatory for both law firms is Cheevin "Lex" Gardner); review and approval, and signing authority, for checks drawn of the operating accounts of the law firms Harry Pavilack and Associates, PA and Pavilack Law Firm, LLC.

9. On October 15, 2010, the Court ordered the Examiner to file a written report with the Court no later than 5:00 p.m. on October 27, 2010.[12]

## Part II - Findings

### Condition of the Debtor's Accounting Records

10. The Examiner has concluded the Debtor's accounting control and information systems are seriously deficient and the Debtor's accounting records are materially incomplete, particularly in the following respects:[13]

---

[11] Case No. 10-06503-JW; Doc. #101 filed and entered on October 14, 2010.
[12] Case No. 10-06503-JW; Doc. #106 filed and entered on October 15, 2010.

a.  Lacking any effective checks and balances, the Debtor has exercised his unfettered ability to move assets (cash and real estate) at his whim (meaning: the Debtor has been unable to explain a business reason for certain pre-petition transfers other than in avoidance of creditor claims) and without due care to preserve and maintain records documenting transactions.[14] During the eight months preceding bankruptcy, the Debtor conducted much of his business affairs via the *cash economy* and failed to maintain records that could show his sources and uses of cash or even the amount of cash on hand as of the date of bankruptcy.

b.  The Debtor owns, controls, and/or manages numerous entities including his law firm and real estate management / investment companies.  The general ledgers[15] for such entities are not accurate, complete or current, and cannot be relied upon to reflect asset and liability balances or income and expenses of the Debtor or the entities under his control or management past December 31, 2007.  For example, the general ledgers omit an accounting for numerous certificates of deposits since December 31, 2007; adjusting journal entries as of December 31, 2008 proposed by the Debtor's prior certified public accountant; certain transfers of real estate;[16] and an accounting

---

[13] Interview notes for Ms. Stoebling, the Debtor's current bookkeeper on October 5, 2010; Ms. Delaplain, the Debtor's former bookkeeper on October 18, 2010; Ms. Laura DuRant on October 18, 2010; the Debtor on October 5 and 14, 2010.  Also, this conclusion is based on review and observation of the Debtor's books and records, including general ledgers.

[14] On October 18, 2010, the Examiner spoke by phone with Ms. Brenda Delaplain, the Debtor's former bookkeeper. Ms. Delaplain attributed the incompleteness of the Debtor's general ledgers to the Debtor's failure to explain the purpose of expenditures leaving her not knowing how to code transactions in the general ledgers.

[15] A "general ledger" is the main accounting record of a business; it is a collection of the accounts that support the values shown in financial statements.  For example, the general ledger account for cash on deposit will reflect all deposits and disbursements through a bank account; the general ledger account for a note payable will reflect the proceeds of a loan as a credit balance and all repayments of principal as debits or charges against the credit balance.

[16] Interview notes for Ms. Stoebling, the Debtor's current bookkeeper, and Ms. Julie Young, the Debtor's bookkeeper responsible for assisting the Webster-Rogers CPA firm in correcting/adjusting the Debtor's 2009 general ledger in preparation of the Debtor's 2009 individual income tax return; and Ms. Montano-Tenan on October 5, 2010.  Mr. Pitch, representing the Debtor, participated in these interviews by phone.  On Tuesday,

for currency transactions since at least February 2010. Ms. Stoebling, the Debtor's bookkeeper, and Ms. Delaplain, the Debtor's former bookkeeper, have informed the Examiner that the balances indicated for any particular general ledger account other than for demand deposit accounts as of any date should not be relied upon. Therefore and although the general ledgers may provide a useful record of deposits and checks on the Debtor's many bank accounts, the ledgers are not reliable to indicate other account balances such as notes payable and affiliated entity due to and due from balances.

    c.   With respect to cash, the Debtor has employed a *rob Peter to pay Paul modus operandi*[17] throughout his empire.   The frequent and numerous asset transfers between the Debtor and entities under his control are poorly documented and remain unaccounted for as loans, distributions, compensation or otherwise.

11.   To test and now as an illustration of the incompleteness of the Debtor's records, the Examiner obtained and consolidated a number of the Debtor's general ledgers.[18]  From the consolidated database, the Examiner selected the following thirteen disbursements and requested the Debtor to produce substantiation for the purpose for each. (Note for

---

October 5, 2010 the Examiner's telephoned Rickie G. Lemay, CPA, the Debtor's prior independent CPA and tax return preparer. According to Mr. Lemay, his normal procedure in preparing annual income tax returns for the Debtor was to prepare an accounting of the Debtor's CDs and enter it in the Debtor's general ledgers.  Then, Mr. Lemay would prepare extensive adjusting journal entries attempting to correct all ledger ending balances.   Mr. Lemay's last accounting services to the Debtor were as of December 31, 2008.   According to an accounting prepared by Mr. Lemay and dated November 20, 2008, the Debtor held certificates of deposit totaling approximately $3 million as of December 31, 2007.

[17] "Rob Peter to pay Paul" is how Mrs. Laura DuRant, CPA, the Debtor's Tax Accountant for the purpose of tracing inter-entity transfers, described the situation during an interview with the Examiner on October 18, 2010.

[18] On Friday, October 1, 2010, the Examiner made an initial visit to the Debtor's place of business in Myrtle Beach and obtained a copy of thirty-nine accounting general ledgers including transactions of the Debtor and many of the affiliated entities controlled or managed by the Debtor.

each disbursement the payee was either "Harry Pavilack" or "Petty Cash" and all occurred during the period April 30, 2010 through May 25, 2010.)

| Entity | Date | Check Ref.[19] | Payee | Offsetting GL Account | Amount |
|---|---|---|---|---|---|
| USA Enterprises | 5/25/2010 | 3060 | Petty Cash | 3500 – Distributions | 50,000.00 |
| Pavil Corp | 5/21/2010 | 1095 | Petty Cash | Petty Cash | 50,000.00 |
| Pavil Corp | 5/21/2010 | 1195 | Petty Cash | Petty Cash | 50,000.00 |
| Harold & P, LLC | 5/19/2010 | counter | Harry Pavilack | Cashed Check | 40,000.00 |
| Pavil Corp | 5/19/2010 | 1005 | Petty Cash | Petty Cash | 20,000.00 |
| Harold & P, LLC | 5/18/2010 | 1051 | Petty Cash | Cashed Check | 50,010.00 |
| Imperial Holdings, LLC | 5/18/2010 | counter | Harry Pavilack | 3500 – Distributions | 40,000.00 |
| Imperial Holdings, LLC | 5/14/2010 | 1054 | Harry Pavilack | 3500 – Distributions | 50,000.00 |
| DTP, LLC[20] | 5/13/2010 | 1086 | Harry Pavilack | Cashed Check | 50,000.00 |
| Pavil Corp | 5/11/2010 | 1091 | Harry Pavilack | Cashed Check | 100,000.00 |
| DTP, LLC | 5/10/2010 | 1085 | Harry Pavilack | Cashed Check | 150,000.00 |
| Imperial Holdings, LLC | 5/5/2010 | 1030 | Harry Pavilack | 3500 – Distributions | 100,000.00 |
| DTP, LLC | 4/30/2010 | counter | Harry Pavilack | Cashed Check | 150,000.00 |

12.  The first request for substantiation was made on Monday, October 4, 2010.[21]  In lieu of providing substantiation, Ms. Stoebling, the Debtor's bookkeeper, informed the Examiner of the Debtor's 2010 cash expenses as follows:[22]

| | |
|---|---:|
| Residence Move | $    30,000 |
| Office Move | 80,000 |
| Warehouse Move-40 years of Client Info | 250,000 |
| Peru -2 trips | 16,000 |
| Atlantic City | 8,000 |
| Miami - 4 trips | 27,000 |
| New York | 9,000 |

---

[19] The disbursements were made on five bank accounts, so the checks reference numbers are not sequential. All of the bank accounts were at Bank of America.

[20] DTP, LLC may be exemplary of many of the Debtor's entities; according to the SC Secretary of State's website, it was formed on December 10, 2009.  According to Michelle Stoebling, a member of the Debtor's accounting staff, DTP, LLC has never commenced business although significant amounts of funds and other assets have passed through it.  Some of the Debtor's entities are simply shells with bank accounts.

[21] The request was sent via e-mail to Mr. McCarthy and the Debtor's bookkeeping assistant, Julie Young (the Debtor did not return the Examiner's call regarding the same).

[22] E-mail on October 4, 2010 from Michelle Stoebling to the Examiner with copy to Mr. McCarthy and Mr. Ouzts.

| | |
|---|---:|
| Atlanta | 10,000 |
| New Residence Rent | 6,600 |
| Attorney-Accountant | 75,000 |
| Payroll-Various Companies | 50,000 |
| Office Cash weekly-36 weeks total | 36,000 |
| Harry Monthly expenses- 9 months | 450,000 |
| 24 hour  Maint. & Rent Collector | 31,200 |
| Pavilack Finance-Defense fees | 4,000 |
| Lawsuit expenses- 70 cases HP | 140,000 |
| Factory Expenses for Mills | 20,000 |
| Travel Expenses- Kershaw- Spindale Mills | 15,000 |
| Travel Expenses- Fayetteville | 10,000 |
| Travel Expenses- Atlanta | 20,000 |
| Travel Expenses- Charlotte | 5,000 |
| Travel Expenses- Greensboro | 5,000 |
| Travel Expenses-Spartanburg | 15,000 |
| Travel Expenses- Decatur, Ill. | 10,000 |
| Travel Expenses- Florida- State wide | 25,000 |
| Travel Expenses Vacant Mills East Coast | 25,000 |
| Materials for repairs various properties | 75,000 |
| Sunrise Construction Materials | 35,000 |
| | $  1,482,800 |

13. On Tuesday, October 5, 2010, the Examiner met with the Debtor from approximately 2:30PM until 5:30PM.  Others present during the meeting included attorney James T. Irwin, Jr., representing the Debtor; Ms. Elizabeth Montano-Tenan, Financial Director for Pavilack Finance and Mortgage and the Debtor; and Mr. Tim Bell, CPA, an associate of the Examiner. Also, Michael Pitch, Esq., an associate of G. William McCarthy, Jr., Esq., ("Mr. McCarthy") Debtor's counsel, participated by telephone.  The Debtor informed the Examiner the information provided by Ms. Stoebling (the analysis of cash expenses totaling $1,482,800) was provided prematurely and should not be relied upon.  Although the Debtor was not prepared to discuss the specific thirteen disbursements and did not produce any substantiation for them as requested, he did submit another summary of his income and expenses as follows:

|  | Income | Expense |
|---|---|---|
| Income from attorneys | 1,396,000 | |
| PFC Interest Income | 37,700 | |
| Settlement income | 6,019 | |
| Pav ind Income | 283,100 | |
| Rental Income | 502,000 | |
| Commission Income | 186,100 | |
| Mortgage & Loan pmts | | 5,809,100 |
| Net Payroll | | 751,500 |
| Payroll Expenses | | 284,100 |
| Property Taxes | | 343,800 |
| Commissions pd out | | 60,000 |
| Rental proceeds to owner | | 121,800 |
| Credit card pmts (& atty) | | 221,400 |
| Earnest Money | | 135,000 |
| Property Insurance | | 545,000 |
| Misc Ins | | 278,700 |
| Advertising Expenses | | 172,000 |
| Bank Fees | | 27,800 |
| Licenses | | 5,000 |
| Car & truck exp & mileage | | 88,100 |
| Contributions | | 33,400 |
| Dues & Subscriptions | | 149,500 |
| Office Equipment | | 44,400 |
| Postage | | 52,940 |
| Printing | | 26,700 |
| Professional Fees | | 811,500 |
| Repairs | | 739,000 |
| Telephone, fax, computers | | 57,690 |
| Travel etc. | | 79,560 |
| Utilities | | 208,500 |
| Office Supplies | | 32,400 |
| PFC Investments | | 82,755 |
| Stock Purchase | | 136,000 |
| St Johns Exp | | 13,250 |
| Medical | | 17,000 |
| Petty Cash | | 5,500 |
| Security & Cleaning | | 39,500 |
| Property Management fees | | 132,000 |
| Property Taxes GA | | 146,570 |
| Payroll GA | | 139,400 |
| Cash Expenses w/receipts | | 38,000 |
| | 2,410,919 | 11,828,865 |

Because the Debtor's accounting records are not accurate, complete, or current and cannot be relied upon to reflect accurately his income and expenses, the Debtor's representation lacks credibility and cannot be verified at this time.

14. On Thursday, October 14, 2010, the Examiner met again with the Debtor in order to follow up and obtain substantiation for the thirteen disbursements.  Claiming he had misunderstood the type of substantiation being sought by the Examiner, the Debtor was again unable to substantiate any particular disbursement.  The Debtor declined the Examiner's offer to recess the interview and allow the Debtor time to find substantiation for even just one of the disbursements.  Declining to do that, the Debtor simply discussed how he had used cash for various purposes during the months immediately preceding the bankruptcy, including the following uses:

- $200,000 to upfit a leasehold interest in the building currently occupied by his law firm;

- "a lot" was spent on a property located at 1775 Rutherford Road in Greenville, South Carolina;

- $18,000 was paid to D.R. Causey for services related to a 575,000 square foot environmentally impacted textile mill in Springdale, North Carolina.

The Examiner requested the Debtor take until the following Monday to reflect on his activities during May, 2010 and produce appropriate substantiation. The Examiner has again requested substantiation from the Debtor via a telephone conference on Monday, October 18, 2010 with Mrs. Montano-Tenan, the Debtor's financial director. No

substantiation or additional information has been provided to the Examiner as of the date of this Report.  The Examiner concludes appropriate substantiation does not exist.

15. In summary, the current condition of the Debtor's accounting records past 2008 is terrible, and presents a formidable examination challenge.  In the absence of reasonably accurate and complete records, the examination must necessarily proceed and depend heavily upon obtaining information from third parties while the Debtor's professionals attempt to bring accounting records up to speed.

### Debtor's Participation in the *Cash Economy*[23]

16. The first indication the Debtor has been involved in the cash economy was provided to the Examiner by Mr. McCarthy during a meeting on Thursday, September 30, 2010.  Mr. McCarthy discussed the Debtor's attempt to deliver $75,000 in cash in payment of professional fee retainers.[24]  Mr. McCarthy also informed the Examiner that this examination would identify significant cash transactions for which there may be no ready support.

17. Five days later, on Tuesday, October 5, 2010, the Debtor informed the Examiner of his participation in the cash economy.  The Debtor discussed his involvement with a venture known as the Pier View Development project and his association with Shaul and Meir Levy ("Levy").  Levy had invested $2.5 million in that project and for whatever reason, the Debtor had given Levy a Confession of Judgment for $2.5 million during February

---

[23] The term *cash economy* is used to describe the part of the economy where goods and services are paid for in cash.
[24] See the *Supplemental Affidavit of G. William McCarthy, Jr*. Case No. 10-06503-JW; Doc. #57 filed and entered on September 30, 2010 disclosing that on or about September 30, 2010, the Debtor arrived at Debtor Counsel's offices for a meeting, carrying the $75,000 retainers in cash and that Debtor had represented the source of such cash currency was Pavilack Mills Corp., an entity owned and controlled by the Debtor but not in bankruptcy.

2008.  When Levy elected to execute the judgment in February, 2010, the Debtor began converting his demand deposit accounts to cash which he kept in safe deposit boxes and elsewhere to avoid having it attached or taken by Levy.[25]

18. The Debtor identified the location of six boxes in Myrtle Beach, and made reference to additional boxes he maintains in Florida.  Although indicating the boxes contained cash, the Debtor refused to discuss the specific contents other than to say the box located at the National Bank of South Carolina branch contained some of his wife's jewelry.  The Debtor refused to estimate the amount of cash he was holding in the safe deposit boxes (the Debtor subsequently claimed his refusal to estimate the amount was because he had no knowledge of the contents of the boxes[26]).

19. At approximately 4:45PM on October 5th, the Examiner requested the Debtor accompany him to the Myrtle Beach area banks to begin an immediate inventory of the boxes.  Due to the lateness in the day and his desire to consult with Mr. McCarthy, the Debtor refused to begin the inventory, and instead offered to have Mr. McCarthy call the Examiner the next day regarding the matter.

20. The Examiner has read Mr. Ouzts' letter dated October 12, 2010 to Joseph F. Buzhardt, the Assistant United States Trustee, detailing his inspection of some of the Debtor's safe deposit boxes on Thursday and Friday, October 7 and 8, 2010.[27]  Therein, Mr. Ouzts reports that fifteen (15) boxes identified by the Debtor to him and located in the Myrtle

---

[25] Examiner's notes of interview with Debtor on October 5, 2010.

[26] The Examiner requested the Debtor to review his file memorandum documenting the interview of the Debtor on October 5, 2010.  See e-mail from Michael Pitch, Esq. on October 15, 2010 relaying the Debtor's first-person comments on the Examiner's file memorandum.

[27] The Examiner understands that on Wednesday, October 6, 2010, Mr. Ouzts was instructed by the Court (during the hearing in Charleston on October 6, 2010 on the Application to Appoint Mr. Ouzts as the Debtor's Accountant) to investigate and inventory any and all safety deposit boxes owned by the Debtor or any entity controlled, managed, or owned by the Debtor.

Beach area were opened by him in the presence of the Debtor and Michael Evans, an associate of the Debtor, and found empty.  After Mr. Ouzts opened the first two empty boxes, he stressed to the Debtor the importance of an accounting for all cash; then, the Debtor began a process lasting over the next four days whereby he turned over three stashes of cash totaling $1,170,604.00.

21. On Thursday, October 7, 2010, the Debtor turned over a first stash[28] of $994,400.00 which was retrieved from the Debtor's closet in his law office.

22. On Friday, October 8, 2010, after again being stressed by Mr. Ouzts, the Debtor turned over a second stash[29] of $95,660.00 from his law office.

23. On Monday, October 11, 2010, and after having the weekend to think about his predicament, the Debtor turned over a third and final stash of $80,544.00.

24. On October 14, 2010, the Examiner interviewed the Debtor a second time.  The Debtor admits he kept no accounting of the source or use of cash funds; e.g. he kept no tally or other records (other than copies of checks as funds were converted to cash) to indicate the amount of cash obtained on a particular date, the actual source of cash, the use of cash, or even a running balance of cash on hand as of any particular point in time.  The Examiner understands the Debtor is attempting to recollect and reconstruct an accounting for his cash activities over the past nine months.[30]

25. Unfortunately, the trail for the Debtor's cash transactions is cold, and accurately reconstructing the trail from the Debtor's memory and from third parties seems a pipe

---

[28] Mr. Ouzts describes this as "a brief case and a large duffel bag which held multiple bags of cash."
[29] Mr. Ouzts describes this as "a small black bag."
[30] Conference with Debtor on Thursday, October 14, 2010 (in attendance were: James Irwin, Esq., Michael Pitch, Esq., Michael Evans, Esq., D. J. Reynolds, Esq. (by phone), William McCarthy, Esq., (by phone intermittently), all representing the Debtor; Mr. Ouzts, the Examiner, and Geoff Levy, Esq., representing the Examiner.

dream.  At this stage, it is impossible for the Examiner to determine if the cash turned

over to date is all or only a portion of the total amount of cash held by the Debtor on the

petition date or thereafter.

**Reduction in Liquidity During 2009**

26. Responsive to the Petitioning Creditors' concern about the Debtor's change in liquidity

during 2009, the Examiner analyzed the Debtor's personal financial statements made as

of the last day of February, June and December 2009.[31]  Although the accuracy of those

statements has not been determined, a summary of them follows:

|  | Feb-09 | Jun-09 | Dec-09 |
|---|---|---|---|
| Gross asset values (without adjustment for Debtor's fractional interest) |  |  |  |
| Cash | 13,407,221 | 10,254,674 | 5,798,908 |
| Direct real estate | 4,800,000 | 4,800,000 | 3,450,000 |
| Undivided Real Estate | 13,920,000 | 14,825,000 | 13,375,000 |
| Miscellaneous entities | 83,295,000 | 77,610,000 | 55,900,000 |
| Pavil Corporation | 41,883,249 | 40,133,249 | 29,463,249 |
| Charlotte Management, Inc. | 4,800,000 | 7,725,000 | 6,625,000 |
|  | 162,105,470 | 155,347,923 | 114,612,157 |
| Gross liabilities | (49,105,000) | (53,940,000) | (57,705,000) |
| Gross assets minus gross liabilities | 113,000,470 | 101,407,923 | 56,907,157 |
|  |  |  |  |
| Debtor's pro rata share of gross assets minus gross liabilities | 56,193,160 | 55,759,542 | 28,459,939 |

27. Although the overall economy and the real estate market in particular since 2008 may

explain much of the reduction in net equity value, those general factors do not explain

---

[31] The subject personal financial statements are included as Wells Fargo's Exhibits A, B and D admitted as evidence in the hearing held on September 8, 2010 on the Expedited Motion to Appoint a Trustee in the involuntary proceeding against the Debtor, Case No. 10-05998-JW.

specifically why the Debtor's cash balances decreased $7.6 million or the $8.6 million increase in liabilities over the last ten months of 2009.[32] The Examiner has not been able to analyze those changes due to the Debtor's incomplete accounting records.

28. The summary above reflects most of the Debtor's wealth being associated with his interests in affiliated entities such as Pavil Corporation and Charlotte Management, Inc., and miscellaneous entities which includes his wholly-owned law firm Harry Pavilack & Associates, P.A.  Normally, an entity will maintain its accounting records and general ledgers in an accurate and complete manner to reflect (a) discrete assets at historical cost; (b) balances owed to financial institutions and others; and (c) rents and/or other income and expenses associated with the entity's property. Again, the general ledgers and other accounting records for affiliated entities are incomplete, and thus are of little aid in resolving this issue.

### Debtor's 2009 Income Tax Return

29. On October 14, 2010, a *Consent Order Authorizing the Limited Appointment of Webster Rogers, LLP, Specifically Laura M. DuRant, CPA, as the Debtor's Tax Accountant and for the Limited Purpose of Making Elections on Debtor's Personal Tax Returns Pursuant to 11 U.S.C. §327(a)* was ordered by the Court.[33] The order authorized the Debtor to employ Webster Rogers, LLP, specifically Laura M. DuRant, CPA, for the limited purpose of filing Debtor's personal tax returns to make elections allowing for an

---

[32] A preliminary listing of indebtedness provided to the Examiner indicates the Debtor has current gross liabilities in excess of $70 million. (E-mail from Elizabeth Montano Tenan on October 18, 2010, transmitting Excel spreadsheet "MasterSheetWebsterRogers10.13").
[33] Case No. 10-06503-JW; Doc. #100 filed and entered on October 14, 2010.

extended 2009 net operating loss carryback under the Worker, Homeownership, and Business Assistance Act of 2009. Such an election was expected to result in the recovery for the estate of almost $200,000 in previously paid taxes.

30. On October 18, 2010, Mrs. DuRant informed the Examiner that she had prepared 2009 tax returns for nine or ten of the Debtor's affiliated entities and an "estimated" 2009 personal return for the Debtor. According to Mrs. DuRant, she was unable to prepare an accurate and complete 2009 personal return for the Debtor because the Debtor's 2009 accounting records are incomplete, and his income and expenses could not be determined.

31. The Examiner considers the Debtor's inability to timely file an accurate and complete 2009 tax return on or before its final due date of October 15, 2010 a serious irregularity.

**Altered Document Issue**

32. The Petitioning Creditors have alleged the Debtor (or employees of Debtor) altered the date on a letter from Atlantic Bank & Trust, addressed to an entity controlled by Debtor, without the consent or knowledge of Atlantic Bank & Trust, and presented such altered correspondence to the Housing Authority of the City of Atlanta, a governmental entity, a discrepancy in forms submitted to a government agency.

33. Elizabeth J. Montano-Tenan, the financial director for Pavilack Finance and Mortgage and the Debtor, testified that upon the Debtor's instruction, she fired Michele McDade on March 2, 2010 for altering the date on a letter to the City of Atlanta.[34]

---

[34] Transcript of hearing on September 8, 2010; Case No. 10-05998-JW; 86:1-23.

34. The Examiner is in the process of locating and contacting Ms. McDade to arrange an interview.

## Other Potential Irregularities

35. Because of the complexity and breadth of the Debtor's estate and limited human resources available to the Debtor for assistance in preparing his Schedules and Statement of Affairs, the Examiner has made limited requests for documents and other information from the Debtor and the Debtor's staff.  As a result, the examination is still in a preliminary stage characterized by far more questions than answers.  However, some of the questions signal serious potential irregularities, and are discussed in the following paragraphs.

36. Peru Global, LLC is a South Carolina Limited Liability Company formed on January 27, 2010.  The registered agent for Peru Global, LLC is Jacob Mullins, a nephew of the Debtor.  The Debtor gave Mr. Mullins a ten (10%) per cent interest in Peru Global, LLC upon formation.[35]  The Debtor caused the following properties to be transferred to Peru Global, LLC during 2010:[36]

- a 1/8 interest in 5,080 acres and mineral rights in Texas;

- 671NE 195th St., Unit 118E, Cedar Glenn;

- 3040 Peachtree Road, Atlanta, Georgia;

- Lots 33 and 34 Conway / 601 Ridge Street; and

- 19501 W. Ctry Club Aventura, Florida (sic).

---

[35] Examiner's notes of interview of Debtor on October 14, 2010.
[36] Debtor's preliminary schedules provided to the Examiner on October 14, 2010.

37. Imperial Holding, LLC is a South Carolina Limited Liability Company formed on January 27, 2010. The registered agent for Imperial Holding, LLC is Jacob Mullins, the Debtor's nephew. Mr. Mullins owns ten (10%) per cent of the membership interests in Imperial Holding, LLC; the Debtor owns the remaining ninety (90%) per cent.[37] The Debtor caused the following properties to be transferred to Imperial Holding, LLC during 2010:[38]

- 123 lots at Ocean Isle Beach, North Carolina;

- 29 acres Marion;

- 2247 Market Street, Wheeling, West Virginia;

- 206 acres Marion;

- 63.5 acres Marion;

- 103 acres Marion;

- 548 acres Marion;

- An interest in the estate of David Pavilack; and

- One hundred (100%) per cent of Pavilack Finance Corporation.

38. Sharon, LLC is a South Carolina Limited Liability Company formed on February 25, 2010. The registered agent for Sharon, LLC is Sharon H. Johnson, a twenty-five year employee and current office manager for the Debtor. On October 14, 2010, the Debtor was asked to explain five (5) consecutive checks each made payable to Sharon, LLC, each dated April 7, 2010, and each paid on Pavil Corporation's account at Bank of America and in the aggregate totaling $248,000.00. The Debtor explained that he

---

[37] Debtor's preliminary schedules provided to the Examiner on October 5, 2010.
[38] Debtor's preliminary schedules provided to the Examiner on October 14, 2010.

intended to lend that money to Sharon Johnson for her to purchase her interest in Sharon, LLC. Instead, he gave Ms. Johnson a ten (10%) per cent interest in both companies "more or less as a bonus."[39] The Examiner has not determined what Sharon, LLC did with the $248,000.00. The Debtor caused the following properties to be transferred to Sharon, LLC during 2010:[40]

- 14 acres in Forestbrook; Lots 17, 18, 19, 20, 21, Bl 2 Wings;

- Lt A 2.55 ac Lot B 81 Wings; (c) 7.20 ac Murrells Inlet;

- 4.72 Murrells Inlet;

- a 1/3 interest in 68 acres in Kane County, Illinois; and

- Main Street, Loris.

Furthermore, the Debtor informed the Examiner that the 1/8 interest in 5,080 acres and mineral rights in Texas noted above as owned by Peru Global, LLC (discussed above) is now or was at some point subsequently owned by Sharon, LLC.[41]

39. Pavilack Finance Corporation is a South Carolina corporation formed on November 5, 2003, and is currently owned one hundred (100%) per cent by Imperial Holding, LLC. Pavilack Finance Corporation is licensed to make real estate loans in South Carolina. Actually, Pavilack Finance Corporation is a mere nominee for non-licensed investors desiring to invest in real estate loans.[42] During May 2010, Pavilack Finance Corporation made fifteen (15) mortgage and note assignments to potential insiders including DTP, LLC (wholly-owned by the Debtor), Lex Gardner (the Debtor's former counsel),

---

[39] Examiner's notes of interview of Debtor on October 14, 2010.
[40] Debtor's preliminary schedules provided to the Examiner on October 14, 2010.
[41] Examiner's notes of interview of Debtor on October 14, 2010.
[42] Examiner's notes of interview of Debtor on October 14, 2010.

Kenneth Talmadge (a co-investor in two deals with the Debtor), and Isaac Shameh (a co-investor in four deals with the Debtor).

40. Recently, the Debtor opened two foreign bank accounts in Peru; each with an initial deposit of $200.[43]   The Debtor has not explained the purpose or need for foreign bank accounts.

## Part III – Approval of the Debtor's Post-Petition Expenditures

41. Another responsibility this Examiner has attempted to fulfill has been the approval of expenditures by the Debtor and entities controlled or managed by the Debtor.   Upon approval of appointment by this Court on Monday, September 27, 2010, the Examiner contacted Debtor's Counsel in an attempt to establish appropriate procedures for approval of expenditures.   On Tuesday, September 28, 2010, the Examiner sponsored a joint conference call with the Debtor's Counsel and counsels for the Petitioning Creditors to discuss such procedures and options for streamlining and/or reducing the Examiner's oversight of expenditures.

42. On the evening of September 28, 2010, the Examiner received a working draft copy of a proposed *Consent Order Amending Provisions in Previous Orders of this Court Regarding the Debtor Using, Acquiring, or Disposing of Assets*.   The terms included in that draft would amend the Examiner Order to allow the Debtor's law firm trust account payments and certain "ordinary course" payments to be made without the prior consent

---

[43] Examiner's notes of interview with Debtor on October 5, 2010.

of the Examiner.  Notwithstanding the discussions and draft order, the Examiner has undertaken the expenditure approval responsibility with the following results.

43. On Wednesday late afternoon, September 29, 2010, the Examiner received a request for approval of three (3) lists of expenditures from Debtor's Counsel.  List One was dated September 23, 2010, and included thirty-five (35) expenditures totaling $13,215.69.  List Two was dated September 27, 2010, and included ten (10) expenditures totaling $13,703.31.  List Three was dated September 28, 2010, and included twenty (20) expenditures totaling $7,746.45.

44. Because none of the expenditures were accompanied by documentation that could be used by the Examiner for approval determination, the Examiner immediately requested Debtor's Counsel to produce such documentation.

45. On Thursday afternoon, September 30, 2010, a fourth list including forty-eight (48) expenditures totaling $20,989.89 was submitted to the Examiner without documentation.

46. Because no response to the request for documentation was received by the close of business Thursday afternoon, September 30, 2010, and because much of the requested expenditures involved past and current payrolls for the Debtor's law firm, the Examiner went to the Debtor's office in Myrtle Beach to obtain documentation on Friday morning, October 1, 2010.  The Examiner met with the Debtor, Ms. Stoebling, Ms. Young, Ms. Montano-Tenan and other persons employed by the Debtor and entities controlled or managed by the Debtor.

47. Ms. Stoebling informed the Examiner that the expenditures listed on the first three (3) requests had been released already without approval; since approval would have had no effect, the Examiner did not request any documentation for those expenditures.

48. Proposed expenditures on the fourth list included expenditures on accounts in the name of the Debtor's law firm; Pavilack Industries, Inc.; and Pavilack Realty & Rental, LLC. The Examiner reviewed the law firm's check register for the post-petition period to get an idea of historical receipts and disbursements. In addition to legal fees, loans from other entities and rents from property not owned by Law Firm have been deposited in the Law Firm bank account, including: electronic transfers of $10,000 on September 7, 2010 from Pavilack Finance; $1,044.44 from Pavilack Realty relating to Crystal property; and $800 on September 17, 2010 from Charlotte Management. Also, Law Firm has made advances to other entities, including: $2,400 on September 13, 2010 to DTP, LLC and $400 on September 13, 2010 to Charlotte Management.

49. The proposed expenditures on the Pavilack Industries, Inc. account totaled approximately $500, and were explained as final reimbursements of expenses advanced by employees associated with 112 houses in Atlanta, Georgia. (The Examiner was informed by Ms. Stoebling on October 1, 2010 that the Debtor has effectively abandoned the houses, and no further expenditures are expected. On October 5, 2010, the Debtor informed the Examiner that was not his intention.)

50. While at the Debtor's office on October 1, 2010, the Examiner was presented with an additional list (the fifth list) of proposed expenditures: all for utility payments totaling about $1,500 for various properties and on various accounts; all were approved for payment.

51. On October 5, 2010, the Examiner was asked to approve twenty-nine (29) expenditures totaling $7,370.16 on various accounts (most being on the law firm's accounts). One proposed expenditure on the law firm account in the amount of $50.37 was not approved

because the invoice indicated it was an expense of Pavilack Industries.  One proposed expenditure on the law firm account in the amount of $91.48 was not approved, as Ms. Stoebling decided it was not necessary to pay. A proposed expenditure of $1,000 on the law firm account payable to Lex Gardner was not approved, as it was described as a professional fee related to the bankruptcy. A proposed payment on the Debtor's Bentley automobile loan in the amount of $852.17 was not approved, as it was a payment to a creditor. A proposed mortgage payment to Horry County Bank on Pavilack Mills Corp.'s property in the amount of $1,030.10 was not approved, as it was a payment to a creditor; however, it was learned that this payment had been released prior to requesting authorization.

52. The Examiner was asked to approve expenditures on October 10 and 12, 2010.  The Examiner did not approve the expenditures because documentation was not provided as needed by the Examiner.

**Part IV - Plan of Work**

53. The *Motion of the United States Trustee for an Order Directing the Appointment of a Chapter 11 Trustee*[44] is scheduled to be heard on November 3, 2010.

54. In the event the Court does not appoint a Chapter 11 Trustee, the Examiner intends to continue reviewing documents and conducting interviews of the Debtor and others having information about the Debtor's financial affairs.

---

[44] Case No. 10-06503-JW; Doc. #87 filed and entered on October 12, 2010.

55. The Examiner believes it is efficient to wait on the Debtor's filing of Rule 2015.3 Reports and on the Debtor's Accountant and Tax Accountant to complete the Debtor's accounting through the Petition Date before continuing detail investigations.  Then, the Examiner intends to analyze the records to identify potential preferential transfers and fraudulent conveyances and investigate the same.

Finally, the Examiner is pleased to report the cooperation and many courtesies extended by all of the professionals involved in this case.

Respectfully Submitted on October 26, 2010.


   /s/ George W. DuRant
George W. DuRant, Examiner
Durant, Schraibman & Lindsay, LLC
4408 Forest Drive, Third Floor
Columbia, South Carolina 29201
Tele. (803) 790-0020
Fax   (803) 790-0011


   /s/ R. Geoffrey Levy
R. Geoffrey Levy
I.D. #2666
Levy Law Firm, LLC
2300 Wayne Street
Columbia, South Carolina 29201
Tele. (803) 256-4693
Fax   (803) 799-5245
Counsel to the Examiner

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| IN RE: | ) | CHAPTER 11 |
| | ) | |
| Harold H. Pavilack, | ) | CASE NO.  10-06503-JW |
| | ) | |
| Debtor. | ) | **CERTIFICATE OF SERVICE** |
| | ) | |

The undersigned hereby certifies that she is the bankruptcy paralegal for the attorney for the Examiner in the within matter, and that on October 26, 2010, she served the First Report of Examiner by emailing same, addressed to:

Joseph F. Buzhardt, III, Esquire
Assistant United States Trustee
email: Joseph.F.Buzhardt@usdoj.gov

Charles S. Altman, Esquire
email: caltman@altmancoker.com

G. William McCarthy, Jr., Esquire
email: bmccarthy@mccarthy-lawfirm.com

David Brian Wheeler, Esquire
email: davidwheeler@mvalaw.com

J. Ronald Jones, Jr., Esquire
email: rjones@clawsonandstaubes.com

 /s/ Robin C. Osborne____
Robin C. Osborne
Bankruptcy Paralegal
Levy Law Firm, LLC
2300 Wayne Street
Columbia, South Carolina 29201
Tele. (803) 256-4693
Fax   (803) 799-5245

October 26, 2010